NORTH STAR TERMINAL AND STEVE-
DORE COMPANY, INC., an Alaska
Corporation, Appellant,

v.

STATE of Alaska and the Alaska
Railroad Corporation, a statutory
public corporation, Appellees.

No. S–4770.

Supreme Court of Alaska.

July 30, 1993.

Thomas E. Meacham, Burr, Pease & Kurtz, Anchorage, for appellant.

Elizabeth J. Barry, Asst. Atty. Gen., Anchorage, Charles E. Cole, Atty. Gen., Juneau, for appellee State.

Phyllis C. Johnson, Office of the Gen. Counsel for Alaska R.R. Corp., Anchorage, for appellee Alaska R.R. corporation.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MATTHEWS, Justice.

### I. INTRODUCTION

This appeal concerns the ownership of tidelands at the Port of Anchorage. North Star Terminal and Stevedore Company, Inc., (North Star) sued the State and the Alaska Railroad Corporation to quiet title in favor of North Star. The trial court ruled that North Star possessed no owner- ship interest in the disputed tidelands. North Star appeals.

### II. FACTS

The tidelands which are the subject of this appeal were previously subject to a quiet title action. *United States v. City of Anchorage*, 437 F.2d 1081 (9th Cir.1971). The tidelands were originally owned by the United States. *Id.* at 1082. However, upon its admission to the Union in 1959, the State of Alaska claimed the tidelands under the Submerged Lands Act of 1953, 43 U.S.C. §§ 1301–1356, and sections 6(k) and (m) of the Alaska Statehood Act, 48 U.S.C. *note prec.* § 21. *Id.* at 1083. In 1961 the State purported to convey the tidelands to the City of Anchorage via State Tidelands Patent No. 10. *Id.* In 1965 the City pur- ported to convey the tidelands via quitclaim deeds to various tideland occupants, includ- ing North Star's predecessor in interest, Cook Inlet Tug & Barge Co. (Cook Inlet). At that time, the United States sued to quiet title to the tidelands, claiming that no transfer of ownership to the State had tak- en place. *Id.* The District Court ruled against the United States. The Ninth Cir- cuit reversed, holding that the United States had by implication reserved the tide- lands for use by the federally owned Alas- ka Railroad in 1915 and that title to the lands remained in the United States after the admission of Alaska into the Union. The Ninth Circuit remanded to the District Court to determine the exact boundaries of the tidelands and to quiet title to them in favor of the United States. *Id.* at 1085.

Rather than have the District Court de- termine the location of the boundaries, on remand the parties entered into a settle- ment agreement which the District Court incorporated in its final judgment. Al- though not a party to the lawsuit, North Star signed the settlement agreement as successor in interest to Cook Inlet. In the agreement, North Star explicitly acknowl- edged that the Alaska Railroad owned the tidelands at issue in fee simple. In addi- tion, the District Court's final judgment explicitly nullified the City of Anchorage's quitclaim deed to Cook Inlet: "all deeds,

leases and other instruments of title heretofore issued by the City of Anchorage for [the tidelands] are declared to be of no effect, and completely null and void."

In 1983 Congress authorized the transfer of the land and other assets of the Alaska Railroad to the State or a State-designated entity. The State created the Alaska Railroad Corporation to receive the railroad's assets and operate the railroad. Pursuant to these acts the tidelands were conveyed by the United States to the Alaska Railroad Corporation in 1985. North Star then brought the present suit to quiet title. All parties moved for summary judgment. The trial court granted summary judgment in favor of the State and the Alaska Railroad Corporation. North Star appeals.

## III. DISCUSSION

■ Essentially, North Star presents three independent arguments.[1] It argues that it owns the tidelands; that even if the Alaska Railroad Corporation would otherwise own the tidelands, the doctrine of estoppel by deed requires the Alaska Railroad Corporation to transfer ownership to North Star; and that AS 38.05.820 provides it with property rights to the tidelands.

### A. *North Star's ownership claim is barred by res judicata.*

■ North Star's ownership claim is based on the premise that Alaska acquired ownership of the tidelands at Statehood.[2] This assertion is contrary to the holding in *City of Anchorage.* The Ninth Circuit specifically held that title to the tidelands did not pass to Alaska upon its admission to the Union. *City of Anchorage,* 437 F.2d at 1085. On remand, pursuant to the agreement of the parties, the District Court's final judgment specifically provided that

the United States owned the tidelands in fee simple. The effect of this final judgment is that no other entity had any interest in the tidelands. *Black's Law Dictionary* 615 (6th ed. 1990) ("A fee simple ... is an estate ... without limitation or condition.").

■ The doctrine of res judicata precludes North Star from relitigating this issue. The Restatement (Second) of Judgments provides, in relevant part: "A judgment [between parties in a former adjudication] ... is conclusive in a subsequent action between [the parties] on the same or a different claim, with respect to any issue actually litigated and determined if its determination was essential to that judgment." Restatement (Second) of Judgments § 17 (1982). Although neither North Star nor the Alaska Railroad were parties to *City of Anchorage,* they are both successors in interest to parties involved in *City of Anchorage.* Thus, section 17 applies to them. Restatement (Second) of Judgments § 43 (1982) ("A judgment in an action that determines interests in real ... property ... [h]as preclusive effects upon a person who succeeds to the interest of a party to the same extent as upon the party himself."); *see also id.* § 43 reporter's note at cmt. a ("When the matter adjudicated concerns title to property ... there is no question that the determination defines a property interest and is carried over upon succession.").

North Star argues that res judicata nonetheless does not apply to the present case for two independent reasons. First, it claims that the issue in the present case is different than the issue in *City of Anchorage.* Second, it claims that a recent United States Supreme Court decision, *Utah Division of State Lands v. United States,* 482

---

1. The parties agree that this appeal involves only legal questions and that there are no disputed issues of material fact. This court decides legal questions *de novo,* adopting the rule of law which "is most persuasive in light of precedent, reason and policy." *Langdon v. Champion,* 745 P.2d 1371, 1372 n. 2 (Alaska 1987) (citations omitted).

2. Specifically, North Star suggests that the United States only retained a right of occupancy, and not a fee simple, in the tidelands. North Star claims that Cook Inlet therefore acquired an ownership interest in the tidelands via the conveyances from the State and the City of Anchorage. North Star argues that when the United States relinquished its right of occupancy in 1985, North Star acquired unencumbered fee title.

U.S. 193, 107 S.Ct. 2318, 96 L.Ed.2d 162 (1987), changed the controlling law and warrants a new determination of its claim to the tidelands. Both arguments lack merit.

■ North Star maintains that the issue involved in the present case is "what sovereign rights and equities the State had in fact acquired in these tidelands at statehood." It argues that the scope of these rights and whether these rights were subsequently conveyed to others was "simply not litigated" in *City of Anchorage.*

We disagree. The Ninth Circuit ruled that title to the tidelands did not pass "to Alaska upon its admission to the Union." *City of Anchorage,* 437 F.2d at 1085. It remanded the case to the District Court with instructions to enter "judgment quieting title in the United States to the tidelands." *Id.* On remand, the District Court incorporated the settlement agreement and expressly ruled that the United States owned the tidelands at issue in this case in fee simple.[3] The court did not reserve any interest in North Star's predecessor. Instead, it declared the instruments purporting to transfer any interest to North Star's predecessor "completely null and void." Thus, the effect of the District Court's ruling is that the State neither acquired nor transferred any rights in the tidelands. *See also Nevada v. United States,* 463 U.S. 110, 129–30, 103 S.Ct. 2906, 2918, 77 L.Ed.2d 509 (1983) ("a final judgment ... 'is a finality ... not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissable matter which might have been offered for that purpose.'" (quoting *Cromwell v. County of Sac,* 94 U.S. 351, 352, 24 L.Ed. 195 (1877)).

As for its second argument, North Star relies on section 28(2)(b) of the Restatement (Second) of Judgments. Section 28(2)(b) recognizes an exception to res judicata when the issue to be relitigated "is one of law and ... a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws." Restatement (Second) of Judgments § 28(2)(b) (1982).

North Star claims that *Utah Division of State Lands* has changed the controlling law, and cites to four cases in support of its claim that section 28(2)(b) permits relitigation of past determinations under such circumstances: *Staten Island Rapid Transit Operating Authority v. Interstate Commerce Commission,* 718 F.2d 533 (2d Cir.1983); *Cole v. Greyhound Lines, Inc.,* 220 Mont. 503, 716 P.2d 611 (1986); *Hodes v. Axelrod,* 70 N.Y.2d 364, 520 N.Y.S.2d 933, 515 N.E.2d 612 (1987); *John P. v. Whalen,* 54 N.Y.2d 89, 444 N.Y.S.2d 598, 429 N.E.2d 117 (1981). None of these cases support North Star's thesis.[4]

In addition, we question whether *Utah Division of State Lands* changed controlling law. The law applied in *Utah Division of State Lands* is summarized in the following passage:

In *Shively[ v. Bowlby,* 152 U.S. 1 at 49–50, 14 S.Ct. 548 at 566–567, 38 L.Ed. 331 (1894) ] and [*United States v. ]Holt State Bank,* [270 U.S. 49 at 55, 46 S.Ct. 197 at 199, 70 L.Ed. 465 (1926) ] this Court observed that Congress "early adopted and constantly has adhered" to a policy of holding land under navigable waters "for the ultimate benefit of future States." Congress, therefore, will defeat a future State's entitlement to land under navigable waters only "in exceptional instanc-

---

3. As noted earlier, "[a] fee simple ... is an estate ... without limitation or condition." *Black's Law Dictionary* 615 (6th ed. 1990).

4. In *Cole,* the Montana Supreme court held that in spite of subsequent change in the law, "res judicata bars the reopening of claimant's original case." *Cole,* 716 P.2d at 613. Thus, *Cole* specifically holds against North Star's position. *Staten Island* involved a redetermination of the law but did not involve an attempt to set aside

an earlier judgment. *Staten Island,* 718 F.2d at 537. *Hodes* and *Whalen* allowed relitigation based on past events, but on the grounds that different legal rights were involved, not on the strength of § 28(2)(b). *Hodes,* 515 N.E.2d at 617 ("the statutory rights of the parties were [so] altered between the first and second proceedings" that "the two proceedings ... lack the requisite identity for application of res judicata.").

es," and in light of this policy, whether faced with a reservation or a conveyance, we simply cannot infer that Congress intended to defeat a future State's title to land under navigable waters "unless the intention was definitely declared or otherwise made very plain."

*Utah Division of State Lands*, 482 U.S. at 201–02, 107 S.Ct. at 2323 (citations omitted). The Supreme Court of the United States did not overrule any of its prior cases in deciding *Utah Division of State Lands*. The Ninth Circuit in *City of Anchorage* relied on *Holt State Bank* and *Shively*, among other decisions. It concluded that the intention of Congress to reserve the tidelands was "obvious," 437 F.2d at 1084, that "establishment of the Alaska Railroad was one of those 'exceptional instances' falling within the exception to the general rule stated in" *Holt State Bank* and *Shively*, *City of Anchorage* at 1085, and that "[b]eyond question, the establishment of the railroad was a 'public exigency', as that phrase was used in those cases." *Id.* Thus in deciding *City of Anchorage* the Ninth Circuit employed the same legal standards endorsed in the *Utah Division of State Lands* opinion.

 Moreover, assuming that *Utah Division of State Lands* did change controlling law, we hold that section 28(2)(b) is inapplicable to North Star's claim. North Star is ultimately seeking not merely a redetermination of the law, but a redetermination of whether in fact title to the tidelands passed to Alaska in 1959. We decline to apply section 28(2)(b) in such circumstances. Section 28(2)(b) is paradigmatically intended to prevent the rigid application of superseded rules of law "to *claims arising after the first proceeding has been concluded.*" Restatement (Second) of Judgments § 28 cmt. b (emphasis added). It is not intended to allow a disgruntled party to challenge "his adverse result based upon the new holding." *Cole*, 716 P.2d at 613.

 Indeed, to allow such challenges in this setting would be to subvert the very purpose of res judicata. We agree with the Washington Supreme Court that change of decisional law does not justify relief from a quiet title decree. *Columbia Rentals, Inc. v. State*, 89 Wash.2d 819, 576 P.2d 62, 65 (1978). In *Columbia Rentals*, plaintiffs owned beach front property. They or their predecessors in interest sued to determine their ocean front boundaries. The last of those actions was resolved in 1961. Judgment in nearly all of the cases was entered by agreement of the parties. The judgments determined that the ocean front boundary was the mean high tide line as of November 11, 1889. Subsequently, in an unrelated action, the United States Supreme Court held that owners of ocean front property were entitled to accretions which had formed along their land. *Hughes v. Washington*, 389 U.S. 290, 292–93, 88 S.Ct. 438, 440, 19 L.Ed.2d 530 (1967). Plaintiffs then sued to quiet title in the accreted lands.

The trial court granted summary judgment to the plaintiffs. The Supreme Court of Washington reversed, holding that res judicata precluded the plaintiffs from relitigating the boundaries of their land. *Columbia Rentals*, 576 P.2d at 65. The court reasoned that "[i]f prior judgments could be modified to conform with subsequent changes in judicial interpretations, we might never see the end of litigation.... [S]hould Hughes be overruled, another suit to again change judgments would be in order. That is precisely what the doctrine of res judicata precludes." *Id.*

We find this reasoning of the Washington Supreme Court particularly compelling in the present setting. As the United States Supreme Court explained over a century ago, "[w]here questions arise which affect titles to land it is of great importance to the public that when they are once decided they should no longer be considered open." *Minnesota Co. v. National Co.*, 70 U.S. (3 Wall.) 332, 334, 18 L.Ed. 42 (1866). Consequently, "[t]he policies advanced by the doctrines of res judicata perhaps are at their zenith in cases concerning real property, land and water." *Nevada v. United States*, 463 U.S. 110, 129 n. 10, 103 S.Ct. 2906, 2918 n. 10, 77 L.Ed.2d 509 (1983).

In sum, North Star's claim that the State received title to the tidelands in 1959 was decided in *City of Anchorage*. It is doubtful whether there has been a change in controlling law. Assuming a change, the change would not provide a proper basis for relitigating this issue. Thus, res judicata precludes North Star's claim.[5]

### B. *Estoppel by deed does not apply to the present case.*

Alternatively North Star argues that the doctrine of estoppel by deed estops the State from denying North Star's rights to the tidelands and requires ownership to pass to North Star. We disagree.

 The doctrine of estoppel by deed generally applies when one later becomes the owner of property he or she previously purported to convey. 6A Richard R. Powell & Patrick J. Rohan, *Powell on Real Property*, ¶ 901[2] at 81A–159 (1993). When the grantor later acquires title, "the after acquired title inures automatically to ... the grantee or his or her successors." *Id.* However estoppel by deed does not apply when the conveyance is made by a quitclaim deed. *Id.* at 81A–160.[6]

 In the present case, the State issued Tidelands Patent No. 10 to the City of Anchorage in 1961.[7] A patent operates as a deed of the government. "As a deed, its operation is that of a quitclaim.... It passes only the title the government has ... on the date of the patent." 63A Am. Jur.2d, *Public Lands* § 77, at 575 (1984). It follows as a general rule that government patents are "without any covenants

of warranty whatever; and it is clear also that the doctrine of estoppel does not apply thereto so as to pass an after-acquired title." *Id.*

 As we have noted in connection with a patent by the United States, the patent's effect is the same as though the United States had executed a quitclaim deed. *City of Anchorage v. Nesbett*, 530 P.2d 1324, 1329 (Alaska 1975) (quoting and relying on *Wilson Cypress Co. v. del Pozo y Marcos*, 236 U.S. 635, 647–48, 35 S.Ct. 446, 451, 59 L.Ed. 758 (1915)). State patents are subject to the same analysis. *William H. McCeney, Jr., Inc. v. Thibadeau*, 215 Md. 77, 137 A.2d 206, 207 (1957) ("the legal effect of a patent is to transfer to the party in whose name it issues all the right which the State possessed in the land that it describes, and no more."). Tidelands Patent No. 10 therefore functioned as a quitclaim deed. Thus, estoppel by deed does not apply in this case.[8]

### C. *AS 38.05.820 does not provide North Star with any rights to the tidelands.*

 North Star argues that AS 38.05.820 provides it with property rights to the tidelands. Alaska Statute 38.05.820(a) "allow[s] preference rights for the acquisition of tide and submerged land" from the State. However, the act that created the Alaska Railroad Corporation specifically provides that AS 38.05.820 does not apply to the operations of the Alaska Railroad Corporation. AS. 42.40.920(b)(11). Since the United States conveyed the tidelands to the Alaska Railroad Corporation, AS 38.05.-

---

**5.** The Alaska Railroad Corporation also argues that North Star contractually released any ownership claims to the tidelands when it signed the final settlement agreement in *City of Anchorage*. Since we hold that res judicata bars North Star's claim, we do not reach this issue.

**6.** This is because estoppel by deed "arises only where a party [assures] the conveyance being made." Powell, *supra*, at 81A–160. In the case of a quitclaim deed, "the grantor merely purports to convey such ... interest as he or she may have, if any. If the grantor does not have title to the property, the grantee cannot claim to have been assured to the contrary." *Id.* at 81A–160 to 161.

**7.** In 1965, the City in turn issued a quitclaim deed for the tidelands at issue to North Star's predecessor in interest.

**8.** The appellees also argue that estoppel by deed does not apply to the present case because the Alaska Railroad was not a privy or party to the earlier conveyance; because the Federal District Court in *City of Anchorage* voided the conveyance; and because estoppel by deed does not apply against the government. In light of our decision, we do not reach these issues.

820 does not provide North Star with any rights to the tidelands.

## IV. CONCLUSION

North Star's ownership claim to the tidelands is barred by res judicata. Estoppel by deed is inapplicable because North Star's predecessor in interest received a quitclaim deed. Alaska Statute 38.05.820 does not provide North Star with any rights to the tidelands because the Alaska Railroad Corporation is exempt from that statute. The trial court was correct in granting summary judgment to the State and the Alaska Railroad Corporation. AF-FIRMED.